UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

THE CITY OF NEW YORK,

                                            Plaintiff,          **COMPLAINT**

-against-                                      CV 06 CV- 2233

A-1 JEWELRY & PAWN, INC.; ADVENTURE
OUTDOORS, INC.; COLE'S GUN SHOP, INC.,
DUNKELBERGER'S       SPORTS      OUTFITTERS,
GALLERY DISTRIBUTING INC.; GREG L. DRIGGERS     WEINSTEIN, J.
d/b/a AAA Gun & Pawn Brokers; THE GUN STORE,
INC., HAROLD W. BABCOCK, JR. d/b/a Webb's                    FILED
Sporting Goods; JAMES THOMAS FARMER d/b/a Jim's          IN CLERK'S OFFICE
Guns and Whatever; MICKALIS PAWN SHOP, LLC;          U S DISTRICT COURT E D N Y
NANCY DAILEY d/b/a Peddler's Post, OLD DOMINION
GUNS & TACKLE, INC.; PATRIOT SERVICES, INC.;  AK, M.J.   MAY 1 5 2006    *
WELSH PAWN SHOP, INC. d/b/a Big Tom's Pawn Shop;
WOODROW C. HOLMAN III d/b/a Woody's Pawn Shop,           BROOKLYN OFFICE

                                            Defendants.

------------------------------------------------------------------------ x

       Plaintiff, the City of New York (the "City"), by its attorneys, Michael A. Cardozo,

Corporation Counsel of the City of New York, and Pillsbury Winthrop Shaw Pittman, LLP, for

its complaint against defendants A-1 Jewelry & Pawn, Inc.; Adventure Outdoors, Inc.; Cole's

Gun Shop, Inc.; Dunkelberger's Sports Outfitters; Gallery Distributing Inc., Greg L. Driggers

d/b/a AAA Gun & Pawn Brokers; The Gun Store, Inc.; Harold W. Babcock, Jr. d/b/a Webb's

Sporting Goods; James Thomas Farmer d/b/a Jim's Guns and Whatever; Mickalis Pawn Shop,

LLC; Nancy Dailey d/b/a Peddler's Post; Old Dominion Guns & Tackle, Inc., Patriot Services,

Inc.; Welsh Pawn Shop, Inc. d/b/a Big Tom's Pawn Shop and Woodrow C. Holman III d/b/a

Woody's Pawn Shop (hereafter, when referred to collectively, "Defendants") alleges as follows:

### Nature of the Action

1       This civil action seeks damages, abatement costs and injunctive relief to remedy the Defendants' creation of and contribution to a public nuisance existing in the City of New York.  The City also seeks to recover damages proximately caused by the Defendants' negligence, negligent entrustment, and negligence *per se* in selling handguns to, and handguns destined for, persons not legally entitled to possess them

2       Gun violence in New York City is a direct result of thousands of handguns in the possession of individuals for whom gun ownership is illegal by reason of their criminal history, mental infirmity, age and/or lack of a license  These individuals (referred to herein as "prohibited possessors") commonly obtain handguns directly or indirectly from federally-licensed gun dealers who abuse the public trust inherent in licensure by intentionally or negligently engaging in certain illegal sales practices, as described herein

3.      The very reason for forbidding prohibited persons from possessing guns is their known propensity to use them to commit crimes   By reason of that propensity, the enormous number of illegally possessed guns in the hands of prohibited persons unequivocally meets the definition of a common law public nuisance – a condition that is injurious to the property, health, safety and comfort of a considerable number of persons   The New York State legislature has in fact declared illegally possessed handguns to be a public nuisance.

4       Evidence of the nuisance takes the form of the near-daily stream of incidents in which City residents, City police officers and City visitors are shot dead or wounded by illegally-possessed handguns   Accordingly, illegally possessed handguns injure the property, health, safety and comfort of a considerable number of persons.

5.      Upon information and belief, Defendant A-1 Jewelry & Pawn, Inc ("A-1") sells or sold handguns at its storefront establishments in Augusta and Hephzibah, Georgia

2

During the period from March 1994 through October 2001, at least 48 guns sold by A-1 were recovered in New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes  Guns sold by A-1 have been recovered in the City in as few as 2 days after their sale by A-1 in Georgia

   6  Upon information and belief, Defendant Adventure Outdoors, Inc ("Adventure Outdoors") sells or sold handguns at its storefront establishment in Smyrna, Georgia  During the period from March 1994 through October 2001, at least 21 guns sold by Adventure Outdoors were recovered in New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes  In the period 1996 through 2000, a total of 254 guns sold by Adventure Outdoors were recovered in connection with crimes, nationwide  Guns sold by Adventure Outdoors have been recovered in the City in as few as 113 days after sale by Adventure Outdoors in Georgia

   7  Upon information and belief, Defendant Cole's Gun Shop, Inc. ("Cole's"), sells or sold handguns from a store in South Boston, Virginia  During the period from March 1994 through October 2001, at least 32 guns sold by Cole's were recovered in New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes  Nearly half of the illegally-possessed guns sold by Cole's were recovered from juveniles  Guns sold by Cole's have been recovered in the City in as few as 3 months after their sale by Cole's in Virginia.

   8  Upon information and belief, Defendant Dunkelberger's Sports Outfitters ("Dunkelberger's"), sells or sold handguns from a store in Stroudsburg, Pennsylvania. During the period from March 1994 through December 2005, at least 94 guns sold by Dunkelberger's were recovered in New York City, both in the hands of individuals with no lawful right to

3

possess a gun and in connection with a variety of violent crimes  Guns sold by Dunkelberger's have been recovered in the City in as few as three weeks after their sale by Dunkelberger's in Pennsylvania.

9      Upon information and belief, Defendant Gallery Distributing Inc ("Gallery Distributing") sells or sold handguns at its storefront establishment in Mount Penn, Pennsylvania. During the period from March 1994 through October 2001, at least 24 guns sold by Gallery Distributing were recovered in New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes.  Guns sold by Gallery Distributing have been recovered in the City in as few as 4 days after their sale by Gallery Distributing in Pennsylvania.

10     Upon information and belief, Defendant Greg L Driggers d/b/a AAA Gun & Pawn Brokers ("AAA Gun") sells or sold handguns at its storefront establishment in Hephzibah, Georgia  During the period from March 1994 through October 2001, at least 16 guns sold by AAA Gun were recovered in New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes  Guns sold by AAA Gun have been recovered in the City in as few as 107 days after sale by AAA Gun in Georgia

11     Upon information and belief, Defendant The Gun Store, Inc. ("The Gun Store") sells or sold handguns from a store in Doraville, Georgia  During the period from March 1994 through December 2005, at least 126 guns sold by the Gun Store were recovered in New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes  In the period 1996 through 2000, a total of 646 guns sold by The Gun Store were recovered in connection with crimes, nationwide  Guns sold by The

4

Gun Store have been recovered in the City as soon as 4 days after their sale by The Gun Store in Georgia  Although of one of the owners of the Gun Store lost his federal firearms license after being convicted of a felony, the store has continued in business under the license of another owner, with no diminution in the number of guns recovered in the City

12.     Upon information and belief, Defendant Harold W Babcock, Jr d/b/a Webb's Sporting Goods ("Webb's") sells or sold handguns at its storefront establishment in Madison Heights, Virginia  During the period from March 1994 through October 2001, at least 15 guns sold by Webb's were recovered in New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes  Guns sold by Webb's have been recovered in the City in as few as 64 days after sale by Webb's in Virginia.

13     Upon information and belief, Defendant James Thomas Farmer d/b/a Jim's Guns and Whatever ("Jim's Guns") sells or sold handguns from a store in Dayton, Ohio  During the period from March 1994 through October 2001, at least 25 guns sold by Jim's Guns were recovered in New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes  Guns sold by Jim's Guns have been recovered in the City as soon as 1 day after their sale by Jim's Guns in Ohio  Indeed, all but 3 of the 25 guns known to be sold by Jim's Guns were recovered in New York City 17 or fewer days after sale  Jim's Guns has had its federal firearms license revoked by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), but continues to sell guns while the matter is on appeal

14     Upon information and belief, Defendant Mickalis Pawn Shop, LLC ("Mickalis Pawn") sells or sold handguns from a store in Summerville, South Carolina.  During the period from March 1994 through October 2001, at least 49 guns sold by Mickalis Pawn were

recovered in New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes  Guns sold by Mickalis Pawn have been recovered in New York City as soon as several weeks after their sale by Mickalis Pawn in South Carolina.

15     Upon information and belief, Defendant Nancy Dailey d/b/a Peddler's Post ("Peddler's Post") sells or sold handguns at a storefront establishment in Washington Court House, Ohio, and from a stand at a flea market in Wilmington, Ohio.  Over several years, Peddler's Post has been implicated in a number of gun trafficking operations involving dozens of guns recovered in New York City.  Additionally, during the period from March 1994 through October 2001, at least 9 guns sold by Peddler's Post were either recovered in or trafficked to New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes.  Guns sold by Peddler's Post have been recovered in the City in as few as 156 days after their sale by Peddler's Post in Ohio

16     Upon information and belief, Defendant Old Dominion Guns & Tackle, Inc. ("Old Dominion") sells or sold handguns at a storefront establishment in Danville, Virginia. During the period from March 1994 through October 2001, at least 15 guns sold by Old Dominion were recovered in New York City, both in the hands individuals with no lawful right to possess a gun and in connection with a variety of violent crimes.  Guns sold by Old Dominion have been recovered in the City as soon as 1 month after their sale by Old Dominion in Virginia

17     Upon information and belief, Defendant Patriot Services, Inc. ("Patriot Services") is a "kitchen table dealer" that sells or sold handguns out of a private home in Richmond, Virginia, and at gun shows around the state  During the period from March 1994 through December 2005, at least 50 guns sold by Patriot Services were recovered in New York

City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes. In the period 1996 through 2000, a total of 210 guns sold by Patriot Services were recovered in connection with crimes, nationwide   Guns sold by Patriot Services have been recovered in the City in as few as 66 days after their sale by Patriot Services in Virginia

18.     Upon information and belief, Defendant Welsh Pawn Shop, Inc. d/b/a Big Tom's Pawn ("Big Tom's") sells or sold handguns at its storefront establishment in Savannah, Georgia   During the period from March 1994 through October 2001, at least 27 guns sold by Big Tom's (and its predecessor, Big Tom's Pawn Shop, Inc ) were recovered in New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes   Guns sold by Big Tom's have been recovered in the City in as few as 30 days after sale by Big Tom's in Georgia

19.     Upon information and belief, Defendant Woodrow C  Holman III d/b/a Woody's Pawn Shop ("Woody's Pawn") sells or sold handguns from a store in Orangeburg, South Carolina. During the period from March 1994 through October 2001, at least 98 guns sold by Woody's Pawn were recovered in New York City, both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes   Guns sold by Woody's Pawn have been recovered in the City in as few as 3 days after their sale by Woody's Pawn in South Carolina

20     Upon information and belief, the ATF is in possession of additional evidence demonstrating that guns sold by the Defendants were recovered both in the hands of individuals with no lawful right to possess a gun and in connection with a variety of violent crimes in New York City between November 2001 and May 2006   ATF has taken the position

7

that recent legislation forbids it from providing this information to the City for the purposes of this lawsuit.

21      Guns sold by the Defendants are recovered from prohibited persons in New York City in numbers that far exceed recoveries for other comparably-situated retail gun dealers   Guns sold by the Defendants are recovered in the hands of prohibited persons in disproportionate numbers because each Defendant sells handguns in a manner that either intentionally violates federal law or is contrary to stated industry practice or otherwise and therefore negligent   Specifically, upon information and belief, Defendants intentionally or negligently sell handguns to prohibited persons through "strawman" purchases, in which an individual legally able to buy a handgun purchases the gun from a licensed gun dealer, intending to transfer it immediately to a prohibited person

22      Defendants know or should know that the handguns they sell in strawman purchases are transferred rapidly to prohibited persons.  Defendants know or should know that they could readily reduce the number of guns transferred to prohibited persons by refusing to engage in straw sales   Yet, upon information and belief, Defendants have failed, and still fail, to take the steps necessary to avoid selling handguns in straw sales.

23      ATF has established that a very small percentage of retail gun dealers – about 1% – are responsible for approximately 57% of the illegally-possessed guns nationwide. The Defendants are among this small group of gun dealers who arm illegal gun possessors.  As such, the Defendants cause, contribute to and maintain a public nuisance within the City of New York

24      The City seeks injunctive relief directing Defendants to cease selling handguns in strawman purchases   The City also seeks to recover its past and future costs of

8

abating the nuisance as well as compensatory damages proximately caused by Defendants' creation and maintenance of a nuisance, negligence, negligent entrustment, and negligence *per se*, together with punitive damages intended to deter these and other handgun dealers from engaging in these unlawful practices

## Jurisdiction and Venue

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U S.C. § 1332 in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different States

26     This Court has personal jurisdiction over Defendants pursuant to N Y CPLR § 302(a)(3), in that each Defendant has committed a series of tortious acts outside of the State that have caused injury within the State and each Defendant derives substantial revenue from interstate commerce and/or from goods used in New York

27     Venue is proper in this Court pursuant to 28 U S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to this claim occurred in this district

## The Parties

28     Plaintiff The City of New York is a municipal corporation existing by and under the laws of the State of New York

29     Upon information and belief, Defendant A-1 Jewelry & Pawn, Inc is a corporation formed under the laws of the State of Georgia, with places of business located at 3036 Deans Bridge Road, Augusta, Georgia 30906 and 1243 Gordon Highway, Augusta, Georgia 30901.

30     Upon information and belief, Defendant Adventure Outdoors, Inc is a corporation formed under the laws of the State of Georgia, with a principal place of business located at 2295 South Cobb Drive, Smyrna, Georgia 30080

9

31.     Upon information and belief, Defendant Cole's Gun Shop, Inc is a corporation formed under the laws of the Commonwealth of Virginia, with a principal place of business located at 204 Broad Street, South Boston, Virginia 24592.

32.     Upon information and belief, Defendant Dunkelberger's Sports Outfitters is a business entity located at 585 Main Street in Stroudsburg, Pennsylvania 18360.

33      Upon information and belief, Defendant Gallery Distributing Inc is a corporation formed under the laws of the Commonwealth of Pennsylvania, with a principal place of business located at 2807 Perkiomen Avenue, Mount Penn, Pennsylvania 19606

34.     Upon information and belief, Defendant Greg L. Driggers d/b/a AAA Gun & Pawn Brokers is a resident of the State of Georgia, with a principal place of business located at 2760 Tobacco Road, Hephzibah, Georgia 30815

35.     Upon information and belief, Defendant The Gun Store, Inc. is a corporation formed under the laws of the State of Georgia, with a principal place of business located at 5093 Buford Highway N E , Doraville, Georgia 30340.

36      Upon information and belief, Defendant Harold W  Babcock, Jr. d/b/a Webb's Sporting Goods is a resident of the Commonwealth of Virginia, with a principal place of business located at 5341 South Amherst Highway, Madison Heights, Virginia 24572

37.     Upon information and belief, Defendant James Thomas Farmer d/b/a Jim's Guns and Whatever is a resident of the State of Ohio, with a principal place of business located at 1148 Richfield Center Road, Dayton, Ohio 45430

38      Upon information and belief, Defendant Mickalis Pawn Shop, LLC is a South Carolina limited liability company with a principal place of business located at 1024 N. Main Street, Summerville, South Carolina 29483.

39.   Upon information and belief, Defendant Nancy Dailey d/b/a Peddler's Post, is a resident of Ohio with a principal place of business located at 219 Draper Street in Washington Court House, Ohio 43160

40   Upon information and belief, Defendant Old Dominion Guns & Tackle, Inc is a corporation formed under the laws of the Commonwealth of Virginia, with a principal place of business located at 7608 Martinsville Highway in Danville, Virginia 24541.

41   Upon information and belief, Defendant Patriot Services, Inc. is a corporation formed under the laws of the Commonwealth of Virginia, with a principal place of business located at 8949 Brucewood Drive, Richmond, Virginia 23235.

42.   Upon information and belief, Defendant Welsh Pawn Shop, Inc  d/b/a Big Tom's Pawn Shop is a corporation formed under the laws of the State of Georgia, with a principal place of business located at 5511 Montgomery Street, Savannah, Georgia 31405.  Upon information and belief, in or about 1996, Welsh Pawn Shop, Inc  acquired Big Tom's Pawn from Big Tom's Pawn, Inc  Big Tom's Pawn, Inc  was a Georgia corporation formed in or about 1985 and held an FFL license   Welsh Pawn Shop, Inc  operates at least five pawn shops in the Savannah area with separate FFL licenses.

43   Upon information and belief, Defendant Woodrow C  Holman III d/b/a Woody's Pawn Shop is a resident of the State of South Carolina, with a principal place of business located at 898 Russell Street in Orangeburg, South Carolina 29115.

**Facts**

**Handgun Violence in the City of New York**

44.   New York City strictly limits the people permitted to possess handguns within the City, and the City has enacted comprehensive gun laws intended, *inter alia*, to keep guns out of the hands of juveniles and criminals   Among other things, the City prohibits the

11

possession of firearms without a license and prohibits possession of firearms by felons, those with mental disorders, and anyone under the age of 21, requires licensees to obtain prior written authorization from NYPD before purchasing guns or purchasing more than one gun; and requires an owner to give notice to the Police Department when selling a gun   38 RCNY §3-01 to 38 RCNY § 5- 33.

45.     Notwithstanding the City's extensive efforts, persons in New York City prohibited by law from owning handguns and persons without the requisite New York City license easily obtain handguns illegally, despite prices that are often two to three times the price charged in a legal gun purchase.

46.     During the 11 year period from 1995 to 2005, NYPD's ballistics analysis unit processed more than 70,000 handguns that had been recovered by NYPD or other law enforcement agencies, 5500 in 2005 alone   Virtually all of the firearms recovered in this 10 year period were recovered from individuals who were prohibited by law from possessing guns.

47     Firearms are by far the preferred method of homicide in New York City, and are used in approximately 60% of the homicides committed each year   Over the ten-year period from 1995 to 2004, approximately 5,400 people died in New York City as a result of gun violence in New York City.   Virtually all of the firearms involved in these homicides were illegally-possessed

48.     Although the NYPD does not keep separate statistics to measure the use of guns in particular types of violent crimes, such as rape, robbery and aggravated assault, of the 792,000 of those crimes between 1995 and 2004, tens of thousands involved the use of handguns   Virtually all of those firearms were illegally-possessed

49      Statistics do not fully convey the effect of illegally-possessed guns on the

health and safety of the City's residents and its visitors   A single City newspaper, the *New York*

*Post*, reported the following gun-related incidents for the five days between April 1 and April 5,

2006

> •      "Police nabbed the man who gunned down two people,
> including one fatally, on a Hunts Point street.  Malik Bryson, 21,
> was arrested at 11:15 a m. Thursday on charges he shot Jessica
> Calzado, 17, to death and injured a 25-year-old man on Southern
> Boulevard at 11 57 p.m  on  Feb.  17,  police  sources  said
> yesterday."

> NYPD Daily Blotter *The New York Post* April 1, 2006.

> •      "Cops have bagged a suspect responsible for robbing three
> Dunkin' Donuts in the past month, including one Tremont store he
> hit twice in the same day  . . [The suspect] produced a silver
> handgun and again fled with a sum of money."

> *Id* , April 2, 2006

> •      "Police yesterday identified a young man who was shot
> dead in a Canarsie housing project over the weekend   He was
> Roshawn Washington, 21, of Linden Boulevard in Brooklyn, who
> was shot three times outside the Brookline Houses on Farragut
> Road at 9:27 p m  Saturday, police said."

> *Id.*, April 3, 2006

> •      "A shooting victim who changed his story four times about
> how he had been shot has now been charged himself, authorities
> said  .   At about 1:30 p m. that day, Hodges walked into Jamaica
> Hospital with a gunshot wound to the leg "

> *Id.*, April 3, 2006.

> •      "Two men were shot in a botched robbery attempt in High
> Bridge, police sources said yesterday.  The victims, ages 27 and
> 24, were walking home from a corner bodega when they were
> accosted by three or four thieves in the lobby of a Sheridan Avenue
> building at 4 30 a.m. on Sunday, sources said.  The thugs tried to
> rob the duo and shot them each in their right legs when they
> resisted."

*Id* , April 4, 2006.

• "Cops are searching for this man after an argument over a soccer game turned fatal at the weekend, police said yesterday The suspect, Bledar Haxhia (above), 24, had exchanged angry words with Besnick Qelia, 27, who was on one of the teams, during the game on Saturday  After the match, Qelia first went to a friend's house.  When he left to go home, Haxhia accosted him on the street and allegedly shot him in the chest, cops said."

*Id* , April 5, 2006

• "A man was shot by an unidentified gunman on a Parkchester street, police sources said yesterday  The 26-year-old victim, whose name was not released, was struck on Archer Street near Beach Avenue at 12:43 a.m Monday, sources said.  The victim was rushed to Jacobi Hospital in stable condition with a gunshot wound to his left shoulder   .."

*Id* , April 5, 2006

50.     On Easter Sunday, April 16, 2006, David Pacheco Jr , a 2 1/2-year-old boy was shot and killed in the Bronx when a stray bullet penetrated his family's minivan.  The shot was fired from a 9 mm handgun following a street dispute at a nearby intersection  The pastor at the church holding David's funeral service, "made a plea during the service to get guns off the streets of New York to prevent more children from dying  'God is sick and tired of our weapons He's sick and tired of our guns.'"  Manny Fernandez, *et al.*, *Sad Farewell to Bronx 2-Year-Old Slain on Easter Sunday*, The New York Times (April 23, 2006).

51     NYPD police officers are the victims of shootings that arise out of criminal activity generally and out of criminal activity that is specifically tied to the supply of illegal guns  For example, two detectives assigned to NYPD's Firearms Investigation Unit, James V Nemorin and Rodney J. Andrews were shot and killed on March 10, 2003, during an undercover operation while attempting to purchase illegal firearms on Staten Island.

14

## The Trafficking of Illegal Guns into New York City

52.     NYPD firearms trafficking investigations reveal that many of the guns purchased on the street from gun traffickers are brand new   Undercover officers frequently are able to buy handguns in their original boxes, with manuals and accessories   The ability to buy new handguns illegally on the street indicates that the guns are being purchased from licensed gun dealers

53     Upon information and belief, illegally-possessed handguns originate principally from retail purchases that take place outside of New York State   Few guns fall into the hands of prohibited persons as a result of theft from lawful owners   Only about 15% of the handguns recovered in the City had been previously reported stolen

54     Upon information and belief, the principal indicator that a dealer is selling to prohibited persons is the number of guns sold by that dealer which are later recovered in connection with crimes   Some dealers sell hundreds of guns later recovered in crimes nationwide; others sell few or none.  Recent research has shown that differences among dealers in the number of guns recovered from illegal possessors is not accounted for by the fact that some dealers merely sell more guns than others

55.     Another indicator widely used by ATF to identify retail dealers that serve as a source of illegally-possessed guns is the time between the retailer's sale of the gun and the gun's recovery in a crime   ATF has found that 43% of the guns used in crimes in urban centers across the United States were purchased from retail dealers less than three years prior to commission of the crime in which the gun was recovered   According to ATF, a relatively short interval between the retail sale of a gun and its recovery in a crime – known as "time to crime" – is an indication that the purchaser planned to transfer the gun to a prohibited person at the time of the purchase   Indeed, ATF's "Project Lead" assumes that a trafficking investigation may be

15

warranted when several guns purchased from the same dealer are recovered with a time to crime of less than 2 years

### Straw Purchases

56    Straw purchases are purchases by legal buyers who intend immediately to transfer the gun to a prohibited person, *i e*, an individual prohibited by state, local or federal law from possessing the gun   In one law enforcement study, more than 50% of the firearms subject to firearm trafficking investigations had been acquired in straw purchases.   According to a United States Department of Justice publication:

> Straw purchases are one of the most frequent methods used to divert firearms out of lawful commerce, where they are a heavily regulated commodity, and onto the street, where they are available to anyone   Convicted felons will simply use a friend, a family member or a girlfriend to buy a gun for them   *The felon provides the money for the gun, selects the gun, and directs the purchase The straw purchaser just fills out all of the required paperwork, posing as the buyer*

*Firearms Trafficking 101 Or Where Do Crime Guns Come From?*   United States Attorneys Bulletin, January 2002 at 7 (emphasis added)

57    According to another United States Department of Justice publication.

> The straw purchase serves as another method often employed by an illegal firearms trafficker who cannot legally purchase firearms   *A common scenario entails the firearm trafficker accompanying the straw purchaser into the firearms store to pay for the purchase while the straw purchaser completes the paperwork*   Store video surveillance can verify this type of purchase.

Joseph P  Greco, *Firearms Trafficking Enforcement Techniques*, The FBI Law Enforcement Bulletin, v  69, n.9 (1968) (emphasis added)

58.    Gun retailers are well aware through law enforcement and industry publications of the existence of straw purchases and the characteristic appearance of a straw

purchase. For example, an instructional pamphlet for gun dealers issued by a gun industry trade

association provides

> **STRAWMAN PURCHASES** Section 12(a) of Form 4473 makes
> it clear that by law, the individual filling out the ATF Form 4473
> firearms transaction record must be purchasing the firearm for
> himself or herself or as a gift. That individual must be the one
> actually paying for the gun. It is illegal for an individual to have
> another person buy him or her a firearm. This is commonly known
> as a "strawman purchase."
>
> A strawman is sometimes used because the actual purchaser is
> prohibited from acquiring the firearm. Consult ATF Form 4473,
> Section 12 for a full disclosure of prohibitions for eligibility to
> purchase a firearm
>
> **IF THE PURCHASER ACTS SUSPICIOUS**
>
> Example:  The key is to engage the customer and ask enough
> questions to draw out information on their background and
> intentions. **If suspicions arise, it is more prudent to follow the
> precautionary principle of politely refusing the sale to protect
> yourself from the risk of contributing to a possible illegal
> transaction.** (original emphasis)
>
> Example.  Bill and Al go to a gun shop because Bill wants a
> shotgun for duck hunting  Bill picks out the gun and gives Al the
> money  Al fills out and signs the sales record and pays for the gun.
> The gun dealer knows the gun is really for Bill, but he knows that
> neither one is a criminal. He lets the deal go down  All three have
> broken the law
>
> It does not matter if both the straw purchaser and the actual buyer
> can legally acquire firearms  By falsely claiming on the federal
> form who the actual buyer is, both parties commit a federal felony.
> **The dealer violates the law as well if aware of the false
> statements on the form.** (emphasis added)
>
> Example  Bob brings his girlfriend Kay to a gun shop  Bob points
> out a pistol to Kay, who asks to see it  She briefly looks at the
> pistol and hands it to Bob who nods his approval and hands the
> pistol back to Kay. Kay then fills out the Form 4473 to purchase
> the pistol.
>
> Observing this, you have reason to believe that Kay may not be the
> actual purchaser, Bob may simply be helping Kay select her first

> handgun or, he may be ineligible to purchase a firearm and is using
> her as a strawman purchaser.

National Shooting Sports Foundation, *Don't Lie for the Other Guy   A Retailers Guide to Recognizing and Deterring Straw Purchases* ("Don't Lie for the Other Guy").

59     According to a videotape presentation by an ATF agent, retailers are instructed that they can prevent straw purchases, and the consequent diversion of firearms into the illegal market, by adhering to an important principle   if one person fills out the paperwork to purchase a firearm, that same person should pay for the firearm   National Shooting Sports Foundation videotape, *Identifying and Deterring Straw Purchasers.*

60     Thus, one explanation for the fact that "Dealer A's" guns are recovered from prohibited persons with greater frequency than "Dealer B" is that Dealer A participates, intentionally or negligently, in straw purchases

61     Consistent with the fact that some dealers participate, whether intentionally or negligently in straw purchases is a recent study demonstrating that retail gun dealers appear to be in a position to control whether the guns they sell are subsequently recovered in criminal hands.  Dealers whose intentional participation in illegal sales is exposed by undercover "stings" show a sharp reduction in the number of guns sold by them that are later recovered in crimes, as compared with sales made before the stings occurred.  Even dealers in the same locality that are not the subject of a sting display a decline in the number of guns later recovered in crimes, confirming that dealers can voluntarily adopt methods to reduce the number of handguns falling into the hands of prohibited persons

### A-1 Jewelry & Pawn

#### A-1's Participation in Straw Sales

62     Upon information and belief, A-1 is well-acquainted with straw purchases, and has intentionally or negligently participated in such sales

63     Between approximately August 1999 and June 2001, two members of a violent gang known to traffic in crack cocaine and prohibited from purchasing guns in Georgia used straw purchasers to acquire over 65 guns from two Augusta, Georgia-area gun dealers, one of which was A-1. Many of the guns were acquired as part of "multiple purchases," the purchase of several guns in one transaction  At least 10 of those guns were recovered in connection with crimes in Staten Island, New York, including assaults, shootings, narcotics offenses, and one homicide  The gang members pleaded guilty to the unlawful sale of firearms.

64     Between approximately April 1999 and April 2002, several people conspired to purchase over 70 handguns from A-1's stores in Augusta and Hephzibah, Georgia for purposes of trafficking them to New York City. In at least eight cases, the serial numbers on these handguns were obliterated  As part of that three-year operation, one person straw purchased a total of 39 guns from A-1  The straw purchases were made on 8 separate occasions. In each purchase, the straw purchaser bought several of the same cheap handguns. On one occasion, the straw purchaser bought 11 "Saturday night specials" – 6 Bryco 9mm pistols, and 5 Bryco .380 caliber pistols  On another occasion, the straw purchaser bought 8 handguns (6 Hi-Point .380 caliber pistols, and 2 Bryco 9mm pistols) at one time, from the same store as the 11 gun purchase

65.     As part of the same gun-trafficking operation, on or about April 8, 2002, a straw purchaser, Erich Olaf Tate, paid a $2,000 cash deposit on an order of 34 handguns, which were to be trafficked to New York City  After the order for 34 handguns, A-1's owner, finally

19

finding it "obvious that [the straw purchaser] was buying more guns than he could use," notified the ATF   *Dealer Admits Traffic In Guns Weapons Were Sold In New York*, Augusta Chronicle, October 24, 2002, p B1

66      In 2002, at a hearing to accept the trafficker's guilty plea, Chief Judge Dudley H. Bowen, Jr of the United States District Court for the Southern District of Georgia, upon learning of the eight previous multiple purchases made by Tate from A-1, "questioned why it took the sale of more than 30 guns to make employees suspicious," especially when, as the trafficker confirmed, "an attentive clerk would have known what he was doing."  Judge Bowen vowed to recommend an investigation of A-1's practices, commenting that "it sure does smell to me "  *Id*

67      A-1 continues to be willing to engage in straw sales.  On or about March 30, 2006, a male and a female investigator retained by the City of New York entered A-1's Augusta, Georgia store and engaged in a simulated straw purchase that displayed all of the observable, in-store characteristics of the straw purchases described above (*supra*, at ¶¶ 56-59), without any subsequent transfer of the gun by the "straw purchaser."  Only the male investigator interacted with an A-1 salesperson, discussing and selecting the handgun to purchase.  Once the male investigator had selected the gun and indicated a desire to purchase it, the female investigator, who had not been a part of the discussion, was summoned to the counter to make the purchase

68      Up to the moment of filling out the required federal documentation, the female investigator was completely uninvolved in the purchase discussions and was off elsewhere, browsing in the store   The A-1 salesperson at the counter, who had shown the Beretta to the male investigator and answered questions about the gun, raised no objections and asked no

questions when the female investigator presented her identification and filled out the federal paperwork

69.     After the completion of the paperwork, the salesperson discussed the suitability of various ammunition with the male investigator, accepted cash payment for the firearm from the male investigator, and handed the firearm to the male investigator  Other than completing the federal paperwork, the female investigator did not participate in the transaction in any manner, nor did she express any interest in the handgun, its capabilities, or suitable ammunition

70     Other gun dealers in the States of Georgia, South Carolina, Virginia, Ohio and Pennsylvania, unequivocally identified the virtually identical scenario, at times staged by the same investigators, as an attempted straw purchase.  Some of those dealers refused to go through with the sales, even informing the investigators that these sales would be illegal.

71     Although there has been no transfer of the gun by the straw purchaser necessary for an actual straw sale, A-1's participation in the simulated straw sale violates Sections 922, 923, 924 and 1001 of Title 18 of the U S  Code and that violation is a proximate cause of the City's injury

72     Upon information and belief, A-1 continues to make straw sales and those handguns sold by A-1 continue to be recovered in New York City from persons prohibited from possessing them and in connection with violent crimes

### A-1's Contribution to the City Gun Nuisance

73     Despite its location approximately 800 miles from New York City, between March 1994 and October 2001, A-1 sold 42 guns recovered in the City  According to

court documents, A-1 has been the source of countless trafficked handguns, many of which have likely never been recovered.

74    Most of the guns sold by A-1 that have been recovered in New York City, were seized from illegal possessors    Many guns sold by A-1 had already been used in connection with serious crimes before they were recovered, including homicide and robbery

75    Some of the reported incidents involving A-1 guns include the following:

- In April 2000, the death in the Bronx of a man as a result of two gunshots to the torso,

- In August 2001, the attempted murder of several uniformed police officers in Queens,

- In January 2000, an attempted drive-by murder, in which shots were fired at an individual by several perpetrators, including a 17-year-old boy, driving through the streets of Brooklyn;

- In December 1999, the carjacking and armed robbery in Brooklyn of a reporter during which a .38-caliber handgun was put to the back of the victim's head,

- In January 1998, the arrest of a 15-year-old boy in Brooklyn found to be in criminal possession of a handgun and over 4 ounces of crack cocaine,

- In February 1998, the arrest of a 16-year-old boy for firing a 38-caliber Lorcin into the air in Brooklyn, and

- In March 1998, October 1998 and September 1999, separate arrests of three 17-year-old boys found to be in criminal possession of .25-calibre Lorcins in Queens and Brooklyn

76    Guns sold by A-1 were recovered in New York City as soon as 2 days after the sale. Seven guns sold by A-1 were recovered in New York City less than 2 weeks after their sale   The average time to crime for the 48 recovered guns traced from A-1 to New York City is 1 29 years, compared to an average time to crime of 6 years for all crime guns recovered in New York City.

77     Some of the guns recovered in the City sold by A-1 had their serial numbers defaced at the time they were recovered.  ATF has reported that a defaced or obliterated serial number is an indication that a gun may have been trafficked

78     Virtually all of the handguns guns sold by A-1 and recovered in the City were "Saturday night specials" – cheap, poorly made handguns favored by criminals, including Bryco Arms, Hi-Points, and Lorcins.

## AAA Gun

### AAA Gun's Participation in Straw Sales

79     Upon information and belief, AAA Gun is well-acquainted with straw purchases, and has intentionally or negligently participated in such sales.

80.     Between approximately August 1999 and June 2001, two members of a violent gang known to traffic in crack cocaine and prohibited from purchasing guns in Georgia used straw purchasers to acquire over 65 guns from two Augusta, Georgia-area gun dealers, one of which was AAA Gun.  Many of the guns were acquired as part of multiple purchases.  At least 10 of the guns were recovered in connection with crimes in Staten Island, New York, including homicide, assaults, shootings and narcotics offenses   The gang members pleaded guilty to the unlawful sale of firearms

81     AAA Gun continues to be willing to engage in straw sales.  On or about April 20, 2006, a male and a female investigator retained by the City of New York entered AAA Guns in Hephzibah, Georgia and engaged in a simulated straw purchase that displayed all of the observable, in-store characteristics of the straw purchases described above (*supra*, at ¶¶ 56-59), without any subsequent transfer of the gun by the "straw purchaser "  Only the male investigator interacted with an AAA Gun salesperson, discussing and selecting a Hi Point 9mm handgun to purchase   Only after the male investigator decided on which gun to purchase was the female

23

investigator, who otherwise had not been part of the transaction, summoned to the counter to fill out the federal paperwork. The salesperson asked no questions of the female investigator, but simply accepted the paperwork from her. The male investigator gave cash for the gun to the salesperson

82.    Other gun dealers in the States of Georgia, South Carolina, Virginia, Ohio and Pennsylvania, unequivocally identified the virtually identical scenario, at times staged by the same investigators, as an attempted straw purchase   Some of those dealers refused to go through with the sales, even informing the investigators that these sales would be illegal.

83    Although there has been no transfer of the gun by the straw purchaser necessary for an actual straw sale, AAA Gun's participation in the simulated straw sale violates Sections 922, 923, 924 and 1001 of Title 18 of the U S. Code and that violation is a proximate cause of the City's injury

84.    Upon information and belief, AAA Gun continues to make straw sales and those handguns sold by AAA Gun continue to be recovered in New York City from persons prohibited from possessing them and in connection with violent crimes.

### AAA Gun's Contribution to the City Gun Nuisance

85.    Despite its location nearly 800 miles from New York City, between March 1994 and October 2001, AAA Gun sold 16 guns recovered in the City

86    Some of the reported incidents involving firearms sold by AAA Gun include the following

- In June 2001, a man shot another man in the Bronx causing serious physical injury;

- In February 1998, a 16-year-old boy and two adults were found in possession of a defaced, loaded .380-caliber gun; and

24

- In incidents in August 1997 and November 2001, New York City men were arrested with bags of drugs and handguns.

87.     Guns sold by AAA Gun were recovered in New York City as soon as 107 days after the sale  The average time to crime for the 16 recovered guns traced from AAA Gun to New York City is 3 2 years, compared to an average time to crime of 6 years for all crime guns recovered in New York City.

88     Some of the guns recovered in the City sold by AAA Gun had their serial numbers defaced at the time they were recovered   ATF has reported that a defaced or obliterated serial number is an indication that a gun may have been trafficked

89     Many of the handguns guns sold by AAA Gun and recovered in the City were "Saturday night specials" – cheap, poorly made handguns favored by criminals, including Bryco Arms, Davis, Lorcin and Hi-Points

**Adventure Outdoors**

**Adventure Outdoors' Participation in Straw Sales**

90     Upon information and belief, Adventure Outdoors has intentionally or negligently participated in straw sales

91.     On or about April 8, 2006, a male and a female investigator retained by the City of New York entered Adventure Outdoors' Smyrna, Georgia store and engaged in a simulated straw purchase that displayed all of the observable, in-store characteristics of the straw purchases described above (*supra*, at ¶¶ 56-59), without any subsequent transfer of the gun by the "straw purchaser."  Only the male investigator interacted with an Adventure Outdoors salesperson in discussing and selecting a Glock 9mm handgun to purchase.  Once the male investigator had the gun and indicated a desire to purchase it, the female investigator, who had not been a part of the discussion, was summoned to the counter to make the purchase.

92.    The female investigator filled out the paperwork    When the male investigator attempted to pay for the gun, the salesperson said that the male investigator needed to initial the form because he was paying for the gun   The male investigator initialed the form, the salesperson performed the background check, and the transaction was completed.

93    Other gun dealers in the States of Georgia, South Carolina, Virginia, Ohio and Pennsylvania, unequivocally identified the virtually identical scenario, at times staged by the same investigators, as an attempted straw purchase   Some of those dealers refused to go through with the sales, even informing the investigators that these sales would be illegal

94    Although there has been no transfer of the gun by the straw purchaser necessary for an actual straw sale, Adventure Outdoors' participation in the simulated straw sale violates Sections 922, 923, 924 and 1001 of Title 18 of the U S  Code and that violation is a proximate cause of the City's injury

95    Upon information and belief, Adventure Outdoors continues to make straw sales and those handguns sold by Adventure Outdoors continue to be recovered in New York City from persons prohibited from possessing them and in connection with violent crimes.

### Adventure Outdoors' Contribution to the City Gun Nuisance

96    A study by the Americans for Gun Safety Foundation ("AGSF") released in January 2004, *see Selling Crime   High Crime Gun Stores Fuel Criminals* (AGSF, January 2004), observes that data collected from 1996 to 2000 showed Adventure Outdoors ranked 82nd on the list of the 120 worst crime gun retailers in the nation   Adventure Outdoors had 254 reported guns recovered in connection with crimes nationwide for the period between 1996 and 2000.

26

97.    Despite its location approximately 800 miles from New York City, between March 1994 and October 2001, Adventure Outdoors sold 21 guns recovered in the City. Most of the guns sold by Adventure Outdoors that have been recovered in New York City, were seized from illegal possessors. Many guns sold by A-1 had already been used in connection with serious crimes before they were recovered, including assault and robbery

98    Some of the reported incidents involving Adventure Outdoors guns include the following:

- In March 1996, the injury of a man shot in the face in Manhattan by another man using a 9mm handgun,

- In April 1996, the robbery of a Manhattan store by two men, one of whom used a 9mm Jennings to threaten the store clerk and to pistol-whip him causing heavy bleeding to his face and head;

- In August 1998 in the Bronx, the arrest of a man who fled the police after threatening another man with a 9mm Bryco,

- In August 2001, the arrest of a man for firing a Glock handgun into the air in Queens, and

- In September 2001, following reports of at least four gun shots fired, police arrested a man following a traffic stop for possession of a loaded .380 Bryco handgun in Queens

99    Guns sold by Adventure Outdoors were recovered in New York City as soon as 113 days after the sale   The average time to crime for the 21 recovered guns traced from Adventure Outdoors to New York City is 3.5 years, compared to an average time to crime of 6 years for all crime guns recovered in New York City.

100.    Some of the guns recovered in the City sold by Adventure Outdoors had their serial numbers defaced at the time they were recovered.  ATF has reported that a defaced or obliterated serial number is an indication that a gun may have been trafficked

101     Many of the handguns guns sold by Adventure Outdoors and recovered in the City were "Saturday night specials" – cheap, poorly made handguns favored by criminals, including Bryco Arms and Hi-Points

## Big Tom's

### Big Tom's Participation in Straw Sales

102.    Upon information and belief, Big Tom's has intentionally or negligently participated in straw sales

103.    On or about April 20, 2006, a male and a female investigator retained by the City of New York entered Big Tom's Savannah, Georgia store and engaged in a simulated straw purchase that displayed all of the observable, in-store characteristics of the straw purchases described above (*supra*, at ¶¶ 56-59), without any subsequent transfer of the gun by the "straw purchaser " Only the male investigator interacted with a Big Tom's salesperson, discussing and selecting a Glock 9mm handgun to purchase.  Once the male investigator had the gun and indicated a desire to purchase it, the female investigator, who had not been a part of the discussion, was summoned to the counter to make the purchase.  The salesperson did not ask any questions of the female investigator, but rather accepted the paperwork from the female investigator and the cash payment from the male investigator

104     Other gun dealers in the States of Georgia, South Carolina, Virginia, Ohio and Pennsylvania, unequivocally identified the virtually identical scenario, at times staged by the same investigators, as an attempted straw purchase  Some of those dealers refused to go through with the sales, even informing the investigators that these sales would be illegal.

105     Although there has been no transfer of the gun by the straw purchaser necessary for an actual straw sale, Big Tom's participation in the simulated straw sale violates

28

Sections 922, 923, 924 and 1001 of Title 18 of the U S. Code and that violation is a proximate cause of the City's injury.

106.    Upon information and belief, Big Tom's continues to make straw sales and those handguns sold by Big Tom's continue to be recovered in New York City from persons prohibited from possessing them and in connection with violent crimes

**Big Tom's Contribution to the City Gun Nuisance**

107    Despite its location more than 800 miles from New York City, between March 1994 and October 2001, Big Tom's (and its predecessor, Big Tom's Pawn Shop, Inc.). sold 27 guns recovered in the City.

108    Some of the reported incidents involving firearms sold by Big Tom's (and its predecessor, Big Tom's Pawn Shop, Inc ) include the following·

- In December 1996, a 14-year-old was arrested in Queens for criminal possession of a 9mm TEC-9 pistol;

- In September 2000, a 17-year-old wanted for robbery was arrested in Brooklyn in possession of crack, a container of marijuana and a Lorcin 380-caliber pistol,

- In November 2000, a man was arrested in Manhattan after shooting someone with a 9mm Bryco handgun; and

- In October 2001, a 16 and 17-year-old were arrested in the Bronx for shooting into a crowd and hitting two men with two 380 semi-automatic handguns

109    Guns sold by Big Tom's (and its predecessor, Big Tom's Pawn Shop, Inc ) were recovered in New York City as soon as 30 days after the sale  The average time to crime for the 16 guns recovered guns traced from Big Tom's Pawn Shop, Inc  to New York City is 5 3 years, and the average time to crime for the 11 guns recovered guns traced from Welsh Pawn Shop, Inc  to New York City is 1 4 years. This compares to an average time to crime of 6 years for all crime guns recovered in New York City

29

110    Some of the guns recovered in the City sold by Big Tom's (and its predecessor, Big Tom's Pawn Shop, Inc.) had their serial numbers defaced at the time they were recovered  ATF has reported that a defaced or obliterated serial number is an indication that a gun may have been trafficked

111    Many of the handguns guns sold by Big Tom's (and its predecessor, Big Tom's Pawn Shop, Inc ) and recovered in the City were "Saturday night specials" – cheap, poorly made handguns favored by criminals, including Bryco Arms, Intratec, Lorcin and Hi-Point.

## Cole's

### Cole's Participates in Straw Sales

112.    Upon information and belief, Cole's has intentionally or negligently engaged in straw sales.

113.    On or about March 14, 2006, a male and a female investigator retained by the City of New York entered Cole's and engaged in a simulated straw purchase that displayed all of the observable, in-store characteristics of the straw purchases described above (*supra*, at ¶¶ 56-59), without any subsequent transfer of the gun by the "straw purchaser."    The male investigator expressed interest in buying a 9mm handgun, while the female investigator wandered around the store.    At one point, the clerk asked the female investigator if he could help her with something, and the male investigator responded – "she's with me, she's looking for something to buy."

114    The male investigator continued to talk to the clerk, discussing gun-related matters.    The clerk, noting that a lot of people from North Carolina attempt to buy guns from him, asked the male investigator if he lived in Virginia, where the store was located    The male investigator then turned to the female investigator and asked "you live in the state, right?"    When

it came time to buy the gun, the male investigator said, "I'm going to get her to do the paperwork here." The clerk responded, "OK." While the female investigator filled out the paperwork, she asked some questions about the forms At one point, the clerk told her, with respect to one of the yes/no questions on the form, "that's the only one you answer 'yes' to "

115.    The clerk discussed ammunition with the male investigator, who indicated he only wanted hollow point bullets, not bullets intended for target practice. The clerk and the male investigator discussed the number and size of magazines that came with the gun The male investigator then paid cash for the gun and ammunition, along with some pepper spray and a spotting scope, while the female investigator stood to the side. At one point during the purchase, the male investigator asked whether the clerk had rung up a spotting scope chosen by the female investigator, and said "that's a big ticket item." The clerk responded, referring to the gun, "I think you're a little bigger "

116     Other gun dealers in the States of Georgia, South Carolina, Virginia, Ohio and Pennsylvania, unequivocally identified the virtually identical scenario, at times staged by the same investigators, as an attempted straw purchase. Some of those dealers refused to go through with the sales, even informing the investigators that these sales would be illegal

117     Although there has been no transfer of the gun by the straw purchaser necessary for an actual straw sale, Cole's participation in the simulated straw sale violates Sections 922, 923, 924 and 1001 of Title 18 of the U S. Code and that violation is a proximate cause of the City's injury

118     Upon information and belief, Cole's continues to make straw sales and those handguns sold by Cole's continue to be recovered in New York City from persons prohibited from possessing them and in connection with violent crimes.

31

## Cole's Contribution to the City Gun Nuisance

119   Despite its location nearly 450 miles from New York City, Cole's sold at least 32 guns recovered in New York City between March 1994 and October 2001.

120.   Of the 32 guns sold by Cole's, most were seized from illegal possessors. Many guns sold by Cole's had already been used in connection with serious crimes before they were recovered, including robbery

121   Cole's appears to specialize in the supply of illegal guns to the youth market – guns bought from Cole's were recovered in 26 crimes in New York City between 1996 and 2002   Of these, 11 incidents involved 13 individuals under the age of 18   Seven of the individuals were 15 years old or younger

122.   The reported incidents involving guns purchased at Cole's include the following:

- In April 1996, a group of men approached a victim in a Brooklyn street, hit him on the head, and threatened to kill him if he did not give them money   One of the perpetrators was in possession of a 25 semi-automatic;

- In April 1996, a 12-year-old brought a loaded Lorcin 380 semiautomatic to Intermediate School 27, the public school he attended on Staten Island;

- In March 1996, a 14-year-old was arrested in a Brooklyn residence for possession of a .380 semiautomatic,

- In January 1998, a 15-year-old was arrested on a street in the Bronx for possession of a Bryco,

- In February 1998, a 15-year-old from Staten Island was arrested in a Staten Island cab for possession of a Smith & Wesson .357 handgun. Three others, all age 20, were also arrested;

- In July 1998, a 14-year-old from Mt Vernon, New York was arrested in the Bronx for possession of a 380 automatic and reckless endangerment   He and a 20-year-old Bronx resident had been discharging the gun into the air "numerous times";

32

- In May 1999, a 22-year-old and an 18-year-old, brandishing a Phoenix .22 handgun, chased a victim down a Brooklyn street following a verbal dispute. Before beginning their pursuit of the victim, the two displayed the gun and said "I'm gonna blow your face off";

- In August 1999, a 16-year-old from Brooklyn was arrested in a Brooklyn residence for possession of a Lorcin .32 caliber gun. He was arrested along with 3 others, aged 42, 34, and 19;

- In October 1999, a 28-year-old man in Manhattan brandished a Lorcin .380 semiautomatic to threaten a 26-year-old woman who had come to his residence to serve him with child support papers. He pointed the loaded gun at her and said "If you do that, I'll kill you";

- In December 1999, a 15-year-old from Brooklyn was arrested on a street in Queens in possession of a Lorcin 9mm handgun and more than 2 ounces of marijuana;

- In December 2000, a 33-year-old from the Bronx was arrested while driving a stolen Hyundai Elantra; he was also found to be in possession of an Intratec 9mm Luger machine gun;

- In March 2001, a 16-year-old boy and a 17-year-old girl were arrested in a Bronx residence for possession of a Lorcin .380 gun;

- In August 2001, an 18-year-old and 17-year-old from Queens shot and killed a 16-year-old on a street in Queens;

- In October 2001, a 15-year-old boy was arrested on a street in Brooklyn for possession of a loaded .32-caliber automatic;

- In June 2002, two 16-year-olds were charged with gun possession for bringing a 22-caliber handgun and a 380-caliber automatic weapon to Tottenville High School on Staten Island.

123    The average time to crime for the 32 guns traced to New York City from Cole's was 3.9 years, compared to a time to crime for all crime guns recovered in New York City of 6 years.

124    Some of the 32 guns recovered in the City that had been sold by Cole's had their serial numbers defaced at the time they were recovered. ATF has reported that a

33

defaced or obliterated serial number is an indication that a gun may have been trafficked, illegally possessed or used in a crime

125     The overwhelming majority of guns recovered in the City that had been sold by Cole's were "Saturday night specials" – cheap, poorly made handguns favored by criminals, including Bryco Arms, Davis Arms, Lorcins and Hi-Points.

### Dunkelberger's Sports Outfitters

### Dunkelberger's Participates in Straw Sales

126     Upon information and belief, Dunkelberger's has intentionally or negligently engaged in straw sales.

127.     On or about April 18, 2006, a male and a female investigator retained by the City of New York entered Dunkelberger's and engaged in a simulated straw purchase that displayed all of the observable, in-store characteristics of the straw purchases described above (*supra*, at ¶¶ 56-59), without any subsequent transfer of the gun by the "straw purchaser." The male investigator expressed interest in buying a 9mm handgun, while the female investigator wandered around the store

128     The male investigator approached the sales counter and a salesperson asked him if he needed help  The male investigator replied, "Yes, I would like to buy a handgun." The salesperson asked, "Do you know what you want?," and the investigator asked if they had any 9 mm handguns. The salesperson told the investigator that the guns he was then looking at were used handguns. The investigator asked if he had anything new  The salesperson then directed the investigator to a different part of the counter and the investigator asked to see a Glock, and was handed a Glock 19   The male investigator handled the gun  While he was looking at it, the salesperson handed him a Glock 23 with a 4-inch barrel. The investigator handed back the Glock 19 and took the Glock 23. The investigator held the gun as if positioning

34

to shoot. After familiarizing himself with the gun, he told the clerk that "this was the gun I want."

129    The clerk said "OK" and returned with the paperwork. The clerk stated that he needed to see two photo I.D.s. It was only at this point that the female investigator, approached the counter and began to hand over her driver's license. The male investigator then began to reach into his pocket and pull out money, holding it in his hands in an obvious manner. The clerk instructed the female investigator how to fill out the paperwork. At this point, the male investigator asked the clerk if he had any "hydro shock ammo." The clerk said yes, and retrieved the ammunition, while still helping the female investigator with the paperwork. After providing copies of the paperwork to the female investigator, the clerk told the male investigator to follow him. The male investigator walked over to the cash register and the clerk began to ring up the items purchased. The clerk informed the male investigator of the total and the male investigator handed the clerk $580 dollars in cash. The clerk then put the gun and the ammunition in a bag, and handed it to the male investigator, who walked out of the store.

130    Other gun dealers in the States of Georgia, South Carolina, Virginia, Ohio and Pennsylvania, unequivocally identified the virtually identical scenario, at times staged by the same investigators, as an attempted straw purchase. Some of those dealers refused to go through with the sales, even informing the investigators that these sales would be illegal.

131.    Although there has been no transfer of the gun by the straw purchaser necessary for an actual straw sale, Dunkelberger's participation in the simulated straw sale violates Sections 922, 923, 924 and 1001 of Title 18 of the U.S. Code and that violation is a proximate cause of the City's injury.

35